IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FRANCHESCA JOHNSON and WANDA DROUILLARD,

    Plaintiffs,

  v.

CVS PHARMACY, INC, a Rhode Island corporation; CVS RX SERVICES, INC., a New York corporation; and DOES I through X, inclusive,

    Defendants.

No. C 10-03232 WHA

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION TO STRIKE**

## INTRODUCTION

This is a wrongful termination action involving a mother and daughter who were terminated from their employment. The employers have moved for summary judgment and to strike corrections to the deposition transcript of one plaintiff. Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. The motion to strike is **DENIED**.

## STATEMENT

Plaintiff Wanda Drouillard began working for Longs Drug Store, now CVS, as a cashier in September 2007. Plaintiff Franchesca Johnson, Drouillard's daughter, began working at Longs in March 2008, at the same store as her mother.

Workplace rumors had it that shift manager Kevin Hope was sleeping with cashier Bre'Anna Brame (Weil Exh. B at 39). On June 22, 2009, Brame sent Johnson an instant message asking why others were talking about her relationship with Hope. During the exchange, which

1  was laced with profanity, Brame stated, "I'll find someone for your ass," which Johnson
2  understood to mean that Brame was going to have someone beat her up (*id.* at 62–73).  Plaintiffs
3  contend that Johnson gave store manager Craig Steinhebel a copy of this instant message
4  exchange at some point between June 22 and June 27, and that Johnson told him "she felt
5  threatened by Bre'Anna and this was proof" (Bissen Exh. C at 49).  Defendants deny this and
6  respond that when asked if she ever told a manager or someone in human resources about the
7  instant message exchange, she testified at her deposition, "No.  Kianna [fellow cashier] did
8  though" (Weil Exh. B at 58).

### 1. THE FIGHTS.

Johnson worked her shift on June 27 (Bissen Exh. B at 82).  Two workplace altercations occurred that day.  At 7:30 p.m., while in the break room, Brame said to Cecilia Smith, another employee, "Boo, bitch" (*id.* at 97).  Shauna Shields, Smith's daughter and also a CVS employee, responded, "Don't talk to my mother that way" (*ibid*).  A fight ensued between Brame and Shields.  After they were separated, assistant manager Robert Ong instructed everyone to go back to work (Weil Exh. B at 112).  Brame, however, told Hope she was going to the break room to call her cousins (Bissen Exh. D at 109).

Around 8:00 p.m., two females entered the store and asked Hope where Brame was, and Hope directed them to the break room (Bissen Exh. B at 119).  Johnson and Drouillard, who was not working that day but came to pick up her daughter, also headed toward the back of the store so Johnson could "clock out" (*id.* at 120).  On the way to the back of the store, the two females walked up to Johnson and asked, "Bitch, was it you fucking with my little cousin?" (*id.* at 122).  Johnson responded, "No, and what if I was?"  The female replied, "Bitch, I'll mace you."  She pulled out a can of mace, attempted to spray Johnson but sprayed a back part of her shirt instead (*id.* at 123–24).  The other female then grabbed Johnson around the waist and hit Johnson on her side.  Johnson punched the female (*id.* at 126).  The two females then pulled Johnson's shirt over her head so Johnson could not see (*id*. at 127).  After Johnson had pushed Drouillard away, Drouillard attempted to call security (Bissen Exh. A at 114).  But then seeing Brame running

2

toward her daughter Johnson, Douillard went back to help Johnson because it was "three on one" (*id*. at 118).

As Drouillard attempted to pull her daughter away, Brame said, "Hell no" and struck Drouillard on the left side of her face and pulled her hair (*id*. at 121–22). Brame and Drouillard began to tussle and fight and roll around on the floor. Eventually, Hope arrived at the scene and removed Drouillard from Brame (*id*. at 123). Johnson walked over to her mother to see if she was okay (Bissen Exh. B at 140). While walking over to her mother, Johnson was grabbed at her wrist by Hope (*ibid.*). According to Johnson, she did not know it was Hope. Upon being grabbed by Hope, Johnson punched him in the left side of his jaw (*id.* at 145). The police arrived and conducted an investigation.

### 2. THE TERMINATIONS.

Assistant manager Ong phoned Steinhebel, who was not on duty that night, to recount the evening's events (Bissen Exh. C at 61). Upon his return to work the following Monday, Steinhebel reviewed witness statements of the events of June 27 and spoke to District Manager Tony Vaz and Employee Relations Manager Carrie Hammond-Holmes (*id*. at 71, 73). Steinhebel initially did not recommend that Johnson be terminated (*id*. at 98). But after Hope told Steinhebel that Johnson pushed him, Steinhebel changed his mind and recommended Johnson be terminated (*id.* at 87, 91). Vaz made the final decision to terminate Shields, Smith, Brame, Drouillard, and Johnson (Bissen Exh. E at 30).

Steinhebel informed plaintiffs they were terminated (Bissen Exhs. B at 166, A at 171). Specifically, Steinhebel told Johnson that she was being terminated because she hit a manager (Bissen Exh. B at 166).

Plaintiffs contend that during their termination meetings, Steinhebel refused to give them their final check unless they signed a form (Bissen Exhs. C at 113, A at 173; *see* Opp. 10). Steinhebel did not release any money to Drouillard at the termination meeting because she refused to sign the form (Bissen Exh. A at 172–73). "Likewise, Steinhebel would not give Johnson any money because she refused to sign" (Opp. 10; *see* Bissen Exh. C at 113 ).

3

Defendants contend, based on Johnson's deposition, that at the termination meeting, Steinhebel presented Johnson with a money order and explained that it represented her last paycheck (Weil Exh. B at 167). At oral argument, defendants stated that they presented Johnson with cash. Johnson refused to sign "an acknowledgment for the money order" because she "fel[t] like [her termination] was a bad decision, that [she] shouldn't have been fired" (Br. 11; Weil Exh. B at 168–69). Her reason for refusing to sign is disputed. Steinhebel met with Drouillard and also asked her to sign the form showing her final pay information. She refused to sign because she "disagreed" with it and "did not want to sign an agreement of termination" (Weil Exh. A at 171–73). Drouillard understood that the money Steinhebel had with him was her final pay (*ibid.*). Steinhebel sent both Johnson and Drouillard a money order by mail, and plaintiffs each received a money order in July (*id.* at 184–87; Weil Exh. B at 197–99).[1]

Plaintiffs filed this action in Alameda County Superior Court. Defendants removed the action here in July 2010 on the basis of diversity jurisdiction. The first amended complaint asserts five claims for relief: (1) wrongful discharge in violation of public policy; (2) failure to maintain a safe workplace; (3) failure to pay wages (waiting time penalties); (4) assault; and (5) battery.

**ANALYSIS**

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial. *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claims, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. If the moving party satisfies

---

[1] Plaintiff Johnson submitted timely corrections to her deposition transcript regarding this issue. Ten of these corrections are the subject of defendants' motion to strike addressed below.

4

its initial burden of production, then the non-moving party must produce admissible evidence to show there exists a genuine issue of material fact. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099 1102–03 (9th Cir. 2000).

### 1.   MOTION TO STRIKE AND OBJECTIONS TO EVIDENCE.

Defendants' move to strike deposition corrections submitted by plaintiff Johnson and contend they contradict sworn statements and create a sham to defeat summary judgment. Johnson submitted 23 changes to her deposition transcript (Weil Exh. B). Defendants state that "[t]en of those changes materially alter and contradict [her] testimony about the reasons Johnson refused her final paycheck," and thus should be stricken (Br. 3).[2]

Untimely deposition corrections made pursuant to FRCP 30(e) are subject to the "sham rule" when offered "solely to create a material factual dispute in a tactical attempt to evade an unfavorable summary judgment." *Hambleton Bros. Lumber Co. v. Balkin Enter. Inc.*, 397 F.3d 1217, 1225 (9th Cir. 2005). Courts have considered various circumstances to determine whether the submission of declaration errata is a sham, such as the "number of corrections, whether the corrections fundamentally change the prior testimony, the impact of the corrections on the case, . . . the timing of the submission of corrections, and the witness's qualifications to testify." *Lewis v. CCPOA Benefit Trust Fund*, No. 08-03228, 2010 WL 3398521 (N.D. Cal. Aug. 27, 2010); *see Hambleton*, 397 F.3d at 1224–25.

Here defendants submitted 23 corrections, only 10 of which are at issue. Each of the 10 corrections at issue was related to Johnson's third claim for waiting time penalties under Labor Code Section 203. Section 203 states that an "employee . . . who refuses to receive the payment when fully tendered to him or her . . . is not entitled to any benefit under this section." Although ten changes seem to be a significant number of changes, they all relate to this same basic topic.

---

[2]Unless otherwise stated, citations in this section are to documents submitted regarding the motion to strike.

5

Four of the changes relate to the issue of *what* plaintiff was asked to sign during the termination meeting. The other six changes relate to the reason Johnson allegedly refused her paycheck.[3]

In her initial testimony Johnson stated multiple times that she did not believe she should have been terminated and she did not want the money offered. At times, she stated she did not want the money and was not going to sign the form provided to her at the termination meeting *because* she should not have been terminated (Weil Exh. B at 4). At other times, she appeared to be asserting, as an independent and separate thought, without more, that she did not believe she should have been terminated (Weil Exh. B at 5).

Plaintiff's changes to her deposition transcript resulted in the omission of any mention of her belief that she should not be terminated. Plaintiff's new answers focused on the fact that she did not sign the form because she did not request advance payment and did not want to sign for something she had not requested (Weil Exh. B at 4–6). Only one answer changed from "yes" to "no," with an explanation following the "no," and was a response to a question that was objected to because it "misstated prior testimony" (Weil Exhs. B at 6, A at 170).

This order notes that even within her original deposition answers, plaintiff would occasionally first answer a question "yes" and then respond with a "no," suggesting plaintiff was at least occasionally confused by the question. Plaintiff is an unsophisticated deponent and the record is replete with objections, interrupting plaintiff's testimony, and likely to have confused her.[4]

The timing of the errata is not suspect. Johnson filed her errata more than seven months *before defendants* filed their motion for summary judgment. Plaintiff's changes to her deposition

---

[3] Defendants move to strike the "ten . . . changes [that] materially alter and contradict [Johnson's] testimony about the reasons Johnson refused her final paycheck" (Br. 3). But defendants do not specifically identify the ten corrections they want stricken. The Court has identified ten corrections as the corrections at issue in the motion to strike based on defendants' minimal guidance: (1) page 168, lines 3–4; (2) page 168, lines 9–10; (3) page 168, lines 13–14; (4) page 168, lines 16–19; (5) page 168, line 25; page 169, lines 1–2; (6) page 169, lines 4–5; (7) page 169, lines 11–15; (8) page 169, lines 22–23; (9) page 170, lines 2–4; and (10) page 170, line 10.

[4] For example, counsel asked (Weil Exh. A at 168):
Q: What do you mean by "sign for the money"?
A: Sign for my last paycheck, I guess. I guess that's what that was.
Q: Like a receipt?
A: Yeah. No. It was a piece of paper saying that I collected whatever, and I was telling him that I'm not collecting that because I don't feel like I should be fired.

6

testimony do not create an issue of fact where one did not already exist as to her third claim. Moreover, the changes were made in full compliance with the procedural aspects of FRCP 30(e). The sham affidavit rule has no application here.

Still, FRCP 30(e) only permits "corrective, and not contradictory changes" to deposition transcripts unless there is a plausible explanation for the contradiction. *Hambleton*, 397 F.3d at 1226. But in *Hambleton*, the deponent failed to comply with the procedural requirements of FRCP 30(e), including failing to submit a list of reasons for each change, missing the deadline to submit corrections, and filing the changes *after* a motion for summary judgment had been filed. All of these facts gave rise to the court's conclusion that the particular deposition errata should be stricken. *Ibid.* None of these facts appear here. At this pre-trial stage, the order concludes that Johnson's errata will not be stricken as contradictory. At trial, of course, defense counsel can impeach with original answers (and plaintiff's counsel can rehabilitate with the corrections). Defendants' motion to strike is therefore **DENIED**.

In the reply to the summary judgment motion, defendants make evidentiary objections to Exhibit J of the declaration of Eileen Bissen on the grounds that it lacks foundation and contains inadmissible hearsay. They also object to Exhibits H and I of the same declaration on the grounds that they are irrelevant, lack foundation, and personal knowledge, and contain inadmissible hearsay (Reply Br. 13–14). This order does not rely on this evidence and therefore need not reach these issues at this time.

### 2. CLAIMS FOR WRONGFUL TERMINATION.

Plaintiffs allege that their termination of employment was in violation of a California public policy in favor of self-defense (First Amd. Compl. ¶¶ 20, 23). To prove the tort of wrongful termination, plaintiffs must show they were terminated for one of the following types of conduct: (1) refusing to violate a statute; (2) performing a statutory obligation; (3) exercising a constitutional or statutory right or privilege; or (4) reporting an alleged violation of a statute of public importance. *Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 76 (1998). Specifically, plaintiffs contend they were terminated for exercising their right to self-defense in violation of public

policy as delineated in article 1, Section 1 of the California State Constitution and Section 50 of the California Civil Code (First Amd. Compl. ¶¶ 20, 23).

In wrongful termination cases alleging a public policy violation, plaintiffs must show that the policy: "(1) [is] delineated in either a constitutional or statutory provision; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than merely the interests of the individual; (3) well established at the time of discharge; and (4) substantial and fundamental." *Stevenson v. Superior Court of Los Angeles Cnty.*, 16 Cal. 4th 880, 894 (1997).

Five years ago, an esteemed colleague on this bench seemed to favor plaintiffs' theory in *Cocchi v. Circuit City Stores, Inc.*, No. 05-1347, 2006 U.S. Dist. LEXIS 20126, at *22–24 (N.D. Cal. Apr. 3, 2006) (Spero, J.).

Thereafter, however, the California Supreme Court narrowed the general theory of public policy torts in *Ross v. RagingWire Telecommunications*. 42 Cal. 4th 920 (2008). *RagingWire* considered whether the statute or constitutional provision in question "sufficiently" described the prohibited conducted such that an employer was on notice of the public policy expressed in the law. *Id.* at 932. In applying this standard, the California Supreme Court concluded, after undertaking an inquiry into the legislative history of the Compassionate Use Act, that it did not "speak to employment law" and that nothing in the "act's text or history indicates the voters intended to articulate any policy concerning marijuana in the employment context, let alone a fundamental public policy requiring employers to accommodate marijuana use by employees." *Ibid*.

Until the appellate state courts in California authoritatively establish a self-defense public policy tort or our own court of appeals does so, the undersigned judge is most reluctant to recognize such a tort, at least on the facts here. While self-defense is important, it is not unique to the workplace, and it would be all too easy to engage in workplace violence and then invoke self-defense, including phony invocations of self-defense. Were a public policy tort recognized, then employers would be deterred from firing violent employees for fear of being sued for infringing a public policy. This is a strong countervailing policy that militates against recognizing any such tort. This is unlike the recognized public policy torts in California in which there is no strong

countervailing policy. And, again, the right to self-defense has no particular anchor in the employment context but is a generalized privilege. Defendants' motion for summary judgment on plaintiffs' wrongful termination claims is **GRANTED**.

### 3. CLAIMS FOR FAILURE TO MAINTAIN A SAFE WORKPLACE.

Plaintiffs allege defendants "owed a duty of care to [p]laintiffs . . . to supervise its employees and maintain a safe and secure workplace," "breached their duty to [p]laintiffs by ignoring and/or disregarding [Brame's] threats," and that "[b]ut for [d]efendants' decision to allow Ms. Blame [sic] to work with [p]laintiff Johnson[,] [p]laintiffs would not have suffered physical harm (First Amd. Compl. ¶¶ 27, 28, 31).

#### A. Johnson's Claim.

An issue exists as to whether Johnson's claim for negligence is barred by the workers' compensation exclusivity doctrine. Defendants bear the burden to prove this affirmative defense. *Iverson v. Atlas Pac. Eng'g*, 143 Cal. App. 3d 219, 224 (1983). Labor Code Section 3600(a) provides that subject to certain particular exceptions and conditions, workers' compensation liability, "in lieu of any other liability whatsoever" will exist "against an employer for any injury sustained by his or her employees arising out of and in the course of the employment." The California Supreme Court has recognized that the:

> basis for the exclusivity rule in workers' compensation law is the 'presumed compensation bargain,' pursuant to which the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded relatively swift and certain payments of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort.

*Fermino v. Fedco, Inc*, 7 Cal 4th 701, 708 (1994). The California Supreme Court has recognized that "certain types of injurious employer misconduct remain outside this bargain." *Ibid.*

Indeed, the California Supreme Court has outlined a tripartite system for classifying injuries arising in the course of employment:

> *First*, there are injuries caused by employer negligence or without employer fault . . . *Second*, there are injuries caused by ordinary employer conduct that intentionally, knowingly or recklessly harms an employee . . . *Third*, there are certain types of intentional employer conduct which bring the employer beyond the

9

>boundaries of the compensation bargain, for which a civil action may be brought.

*Id.* at 713–14.  Specifically, "[i]njuries caused by unsafe working conditions are compensable solely under workers' compensation." *Vuillemainroy v. Am. Rock & Asphalt*, 70 Cal. App. 4th 1280, 1286 (1999); *Fermino*, 7 Cal 4th at 711–12 (concluding employers may be subject to common law liability "where the employer is charged with intentional misconduct which goes beyond his failure to assure that the tools or substances used by the employee or the physical environment of a workplace are safe").

Defendants contend that Johnson's claim for failure to maintain a safe workplace is "preempted by workers' compensation because the injuries that Johnson sustained in the altercation arose out of her employment and were a risk encompassed within the compensation bargain" (Br. 20–21).  Plaintiff responds that although she was "on the clock at the time" of the incident, her claim is not barred because injuries "sustained at the hand of two non-employees are not attributable to plaintiff's status as an employee of Defendants" (Opp. 19).  Although it is unclear from the first amended complaint what cause of action plaintiff brings in claim two, the claim at issue here, plaintiff does assert in the opposition brief that her claim is, indeed, for negligence.  This order addresses the claim as such.

*Fermino* does not recognize a "beyond the compensation bargain" exception for negligence claims.  Moreover, California courts have recognized that injuries from an assault by a third party, non-employer arise out of the course and scope of employment and constitute a risk encompassed within the compensation bargain.  In *Arendell v. Auto Parts Club, Inc.*, for example, the California Court of Appeal affirmed the trial court's grant of summary judgment for an employer where an employee, who was injured by three non-employees during a robbery, sued the employer for negligence (among other claims) alleging that the employer had failed to provide adequate security for employees despite a known crime risk.  There, applying the tripartite classification system established in *Fermino*, the California Court of Appeal reasoned that "[s]adly, in these days of increased urban crimes of violence, such crimes can also occur in the workplace, just as they do on the street. . . . An employer's failure to take adequate security

10

measures despite a known risk of harm may be reprehensible," but it invokes no exception to the exclusivity doctrine. 29 Cal. App. 4th 1261, 1265–66 (1994).

Plaintiff Johnson does not dispute that her injury occurred in the course of employment. She only disputes that the injury did not "arise out of" the employment. Plaintiff cites only one decision from 1966, *Howard v. WCAB,* to support this point. 31 Cal. Comp. Case 358, 358–59 (1966). In *Howard*, the court held that the claimant did not sustain an injury arising out of the employment because personal hostility to Howard, not his employment, put him at risk of assault and he was injured *after* his work shift and *outside* his place of employment. Thus, *Howard* is inapposite here. Defendants' motion for summary judgment on Johnson's second claim is **GRANTED**.

### B.     Drouillard's Claim.

Plaintiff Drouillard also brings a negligence claim against defendants. It is undisputed that Drouillard was *not* working the evening of June 27 and was, therefore, not present in the store in her capacity as an employee (Bissen Exh. B at 120). An employer has a duty of care to third persons only "when the employer knows, or should know, facts which would warn a reasonable person that the employee presents an undue risk of harm to third persons *in light of the particular work to be performed.*" *Frederico v. Superior Court*, 59 Cal. App. 4th 1207, 1214 (1997) (emphasis added).

Defendants have not carried their burden of producing evidence that negates an essential element of plaintiff's negligence claim or showing that plaintiff does not have enough evidence of an essential element to carry her ultimate burden of persuasion at trial. Defendants' motion for summary judgment on plaintiff Drouillard's negligence claim is **DENIED**.

### 4.     CLAIMS FOR WAITING TIME PENALTIES.

Plaintiffs allege that defendants violated California Labor Code Sections 201(a), 203(a), and 227.3 "by refusing to pay plaintiffs all wages due at the time of their respective terminations" (First Amd. Compl. ¶ 42).

Section 201(a) states that, "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." Section 203(a) states, in

relevant part, "[i]f an employer willfully fails to pay . . . the wage of the employee shall continue as a penalty from the due date thereof at the same rate . . . but the wages shall not continue for more than 30 days." Section 227.3 states, "[u]nless otherwise provided by a collective-bargaining agreement, whenever a contract of employment or employer policy provides for paid vacations, and an employee is terminated without having taken off his vested vacation time, all vested vacation shall be paid to him as wages."

Section 201 has been interpreted to prevent an employer from placing conditions on final payment of wages:

> [T]here is no provision in the labor code allowing an employer to condition the required payment of earned wages upon discharge or upon resignation on the employee's signing of a release or on any other conduct by the employee. In our view, the plain language of the Labor Code sections 201 and 202 compels the conclusion that the required payment of earned wages is *unconditional*.

*Singh v. Southland Stone, U.S.A., Inc.*, 186 Cal. App. 4th 338, 364 (2010) (emphasis added).

It is undisputed that during the termination meeting Steinhebel asked plaintiffs to sign a document. It is undisputed that plaintiffs did not sign the document and plaintiffs did not receive their final pay check at that time (Br. 11; Bissen Exhs. A at 172–73, C at 113). A reasonable trier of fact could conclude that defendants placed a condition on plaintiffs' receipt of their final pay check. Defendants' motion for summary judgment on plaintiffs' third claim is **DENIED**.

### 5.   CLAIMS FOR ASSAULT AND BATTERY.

Plaintiffs allege against defendants claims for assault and battery based on the doctrine of ratification. For both claims, plaintiffs contend that defendants were (First Amd. Compl. ¶¶ 46, 48, 52, 54):

> aware [beginning June 25] that Ms. Blame [sic] threatened Plaintiff Johnson and others, yet did nothing to protect the threatened employees. . . . Defendants were aware that Blame [sic] was involved in a physical altercation with another employee on June 27 . . . yet did nothing to discipline her. Rather, they allowed her to remain at work. As such, Defendants ratified Ms. Blame's [sic] behavior.

Plaintiffs further allege that "Ms. Blame" assaulted and battered each of them (First Amd. Compl. ¶¶ 49, 55, 56). Plaintiffs bear the burden of proof on their tort claims.

12

An "employer can be held civilly liable as a joint participant in assaultive conduct committed by its employee pursuant to the doctrine of ratification." *Fretland v. Cnty. of Humboldt*, 69 Cal. App. 4th 1478, 1489–90 (1999). "Ratification is the voluntary election by a person to adopt in some manner as his own *an act* which was purportedly done on his behalf by another person." *Id.* at 1490–91. The "failure to discharge an . . . employee *may* be evidence of ratification." *Murillo v. Rite Stuff Foods, Inc.*, 65 Cal. App. 4th 833, 852 (1998). "If the employer, after knowledge of or opportunity to learn of the agent's misconduct, continues the wrongdoer in service, the employer may become an abettor and may make himself liable in punitive damages." *Ibid.*, citing *McChristian v. Popkin*, 75 Cal. App. 2d 249, 256 (1946).

Plaintiffs contend that *prior* to the alleged assaults and batteries, defendants had knowledge of two incidents of misconduct by Brame. "First, it knew Brame sent an instant text message to Johnson in which Brame warned, 'I'm going to find someone for yo ass' . . . [and] CVS also knew that Johnson felt threatened by Brame, yet did nothing" (Opp. 24; Bissen Exh. C at 48–49). "Second, Defendants knew that Brame had assaulted other employees . . . that same night" (Opp. 24; Bissen Exh. D at 109).

Even assuming defendants ratified Brame's previous two misconducts, "this would not constitute ratification of the separate and distinct alleged acts of assault or battery." *Franklin v. S. California Permanente Med. Group*, No. 05-0330, 2006 WL 53091515 (C.D. Cal. Nov. 7, 2006). It is undisputed that defendants immediately conducted an inquiry into the two fights occurring on June 27, which resulted in plaintiffs' alleged assaults and batteries, and soon thereafter made the decision to terminate Brame (Bissen Exh. E at 30). Plaintiffs do not put forward evidence to show defendants did anything to ratify Brame's alleged battery and assault of either of them. No genuine issue of material fact in the record exists as to whether defendants terminated Brame soon after the alleged assaults and batteries. Thus, this leaves no room for any inference that defendants ratified the alleged batteries or assaults. Defendants' motion for summary judgment on Drouillard and Johnson's assault and battery claims is **GRANTED**.

**CONCLUSION**

For the reasons set forth above, defendants' motion to strike is **DENIED**, and defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. Plaintiff Drouillard's claim for failure to maintain a safe workplace and each of plaintiffs' claims for waiting time penalties remain for trial.

**IT IS SO ORDERED.**

Dated: October 11, 2011.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

14